08 CV 6568

JUDGE LYNCH

399-08/WLJ

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
MOCOH SA
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
William L. Juska Jr. (WJ 0772)
Daniel J. Fitzgerald (DJ 6313)
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

MOCOH SA,

                                    Plaintiff,

        - against --

FAL SHIPPING CO. LTD.,

                                    Defendant.
----------------------------------------------------------------x

RECEIVED
JUL 2 4 2008
08 U.S.D.C. S.D. N.Y.
CASHIERS

**VERIFIED COMPLAINT**

        Plaintiff, MOCOH SA (hereinafter "MOCOH"), by its attorneys Freehill, Hogan &

Mahar, LLP, as and for its Verified Complaint against Defendant FAL SHIPPING CO. LTD.,

(hereinafter "FAL"), alleges upon information and belief as follows:

        1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract

of charter party.    This case also falls under this Court's admiralty and maritime jurisdiction

pursuant to 28 U.S.C. §1333.    Jurisdiction is also proper pursuant to the Court's federal question

jurisdiction pursuant to 28 U.S.C. §1331.    Federal jurisdiction also exists because the action

arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral

Awards at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2.    At all times relevant hereto, Plaintiff MOCOH was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 14, rue Etienne Dumont, 1204 Geneva, Switzerland.

3.    At all times relevant hereto, Defendant FAL was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an office and place of business at Sharjah, United Arab Emirates.

4.    On or about December 18, 2007, Plaintiff MOCOH, as disponent owner, and Defendant FAL, as charterer, entered into a maritime contract of charter party on an amended ASBATANKVOY form for the use and operation of the M/T GENERAL HAZI ASLANOV (a copy of the "recap" dated December 18, 2007 including Defendant FAL's additional clauses is annexed hereto as Exhibit A).

5.    Pursuant to the terms of the charter party, the vessel arrived at Mersin, Turkey to load a cargo of gasoil and proceeded thereafter to the discharge port of Thessaloniki, Greece..

6.    During the performance of the charter party, Defendant FAL incurred demurrage for which it is liable to Plaintiff MOCOH under the terms of the charter party.

7.    The demurrage incurred by Defendant FAL amounts to $39,294.60, and is set forth in the revised Laytime and Demurrage Calculation sent to FAL on July 18, 2008 by MOCOH's English solicitors, Davies Johnson & Co. A copy of the Laytime and Demurrage Calculation is annexed hereto as Exhibit B.  Defendant FAL also ignored a prior demurrage invoice sent on/about January 17, 2008.

8.    The total outstanding amount due Plaintiff MOCOH therefore is $39,294.60.

9.  In breach of the charter party and despite due demand by Plaintiff MOCOH, Defendant FAL has failed and otherwise refused to pay the demurrage despite same being due and owing presently.

10.  Plaintiff MOCOH has fulfilled all obligations required of it under the Charter Party.

11.  The charter party provides for the application of English Law and any dispute arising thereunder is to be referred to arbitration, and Plaintiff MOCOH specifically reserves its right to arbitrate the substantive matters at issue.

12.  This action is brought to obtain jurisdiction over the Defendant, security in favor of Plaintiff MOCOH in respect to its claims against Defendant and in aid of arbitration proceedings and to compel Defendant's appearance in the arbitration.

13.  Under the arbitration clause of the charter party, costs including attorneys' fees, arbitrators' fees, disbursements and interest may be awarded.

14.  This action is further brought to obtain security for the additional sums which are recoverable including Plaintiff's anticipated attorneys' and arbitrators' fees and costs in the arbitration proceeding and interest, all of which are recoverable as part of Plaintiff's claim under English law.

15.  Plaintiff estimates, as nearly as can be computed, that the legal expenses and costs of prosecuting the claim in arbitration will be $45,000, and interest on its damages are estimated to be $5,849.56 (calculated at the rate of 7% for a period of 2.0 years, the estimated time for completion of the proceedings in London, and compounded quarterly) including any appeal of any arbitration award issued.

### Request for Rule B Relief

16. Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant (collectively hereinafter, "ASSETS") at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

17. The total amount to be attached pursuant to the calculations set forth above is **$90,144.16**.

WHEREFORE, Plaintiff MOCOH SA prays:

a.      That process in due form of law according to the practice of this Court may issue against Defendant citing it to appear and answer the foregoing;

b.      That if Defendant cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant up to and including $90,144.16 be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendants (collectively hereinafter, "ASSETS"), at, through, or within the possession, custody or control of such banking institutions and/or any such other

garnishees who may be served with a copy of the Process of Maritime Attachment

and Garnishment issued herein;

c.    That this Court retain jurisdiction over the matter for any subsequent enforcement

action as may be necessary; and

d.    For such other, further and different relief, as the Court may deem just and proper

in the premises.

Dated: New York, New York
        July 24, 2008

                            FREEHILL HOGAN & MAHAR, LLP
                            Attorneys for Plaintiff
                            MOCOH SA


                            By: _____
                                William L. Juska, Jr. (WJ 0772)
                                Daniel J. Fitzgerald (DJ 6313)
                                80 Pine Street
                                New York, NY  10005
                                (212) 425-1900

## ATTORNEY VERIFICATION

State of New York    )
                     ) ss.:
County of New York   )

WILLIAM L. JUSKA, JR., being duly sworn, deposes and says as follows:

1.    I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.    The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3.    The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
William. L. Juska, Jr.

Sworn to before me this
24th day of July, 2008

_____
Notary Public

CLARE HENRY
Notary Public, State of New York
No. 01HE4831498
Qualified in Kings County
Certificate in New York County
Commission Expires October 31, 2009

Exhibit A

## JUSKA, WILLIAM

| | |
|---|---|
| **From:** | Mocoh Demurrage Department [demurrage@Mocoh.com] |
| **Sent:** | Monday, July 07, 2008 10:28 AM |
| **To:** | Charles Patterson |
| **Subject:** | G.H. Aslanov - Acct FalOil - demurrage |
| **Follow Up Flag:** | E0000773 |
| **Flag Status:** | Flagged |
| **Attachments:** | General Hazi Aslanov Q88.doc; FAL SHIPPING ASBATANKVOY TERMS REVISED 8 AUGUST 07.doc |

Hi Charles,
Further to my msg today herewith the fixture recap.
regards,
Jeff

---

**From:** Edward Owen [mailto:eowen@hdixonshipbrokers.co.uk]
**Sent:** 18 December 2007 17:02
**To:** James van Oppen
**Subject:** FW: MT General Hazi Aslanov - Acct FalOil - Mersin / Thessaloniki - CP dd 18th Dec, 2007

- CHARTER PARTY TO BE DATED    : 18th December, 2007

NAME:  MT GENERAL HAZİ ASLANOV
BUİLT: 2005
DWT :  6477
DRAFT: 4.30 MTRS
CARGO CPC: 7294.30 CBM
EPOXY   COATED TANKS
LOA/BEAM :138.70/16.50 MTRS

- Q88 TO BE PART OF THE FINAL FIXTURE    :  SEE ATTACHMENT

- OWNERS CONFIRM THAT ALL HER CERTIFICATES
  ARE VALID THROUGHOUT THE EXECUTION OF
  THE CONTRACT/VOYAGE.                    : YES

- VESSEL IS FULLY SBT                     : YES

- TTBOOK NOT REJECTED BY                  : NA

)) T/C OWNERS                  |  MOCOH UK

| | |
|---|---|
| .AST 3 CARGOES | LAST         : FUEL OIL<br>2ND LAST   : FUEL OIL<br>3RD LAST   : FUEL OIL |
| :TENERY | OPEN TURKISH CYPRUS NOW. ETA MERSIN ABT 19th DEC, NOON TIME AGW WP. |

FOR ONE (1) VOY OF

| | |
|---|---|
| · ACCT / CHARTERS | FALOIL GROUP |
| · CARGO | MIN /MAX 2,000 MTS - ONE GRDE GASOIL WITH AN NPA OF 4.5 |
| · LOAD PORT | OSP MERSIN (TUTA TERMINAL) |
| · DISCH PORT | OSP THESSALONIKI |
| · LAY / CAN | 19-20 DEC 2007 |
| · FREIGHT | USD 66,500 LUMPSUM - BSS 1/1 |
| · FRIGHT PAYMENT | DUE TO OWNRS CARGO A/O SHIP LOST OR NOT LOST, AND IS PAYABLE TO OWNER'S DESIGNATED BANK ACCT AGAINST TLX/EMAIL INVOICE, WITHIN 3 BANKING DAYS AFTER DISCHARGING. |
| · LAYTIME | 40 HRS TTL SHINC +6+6 HRS NOR EACH PORT |
| · DEMURRAGE | USD 8,000 PDPR/FD |
| · AGENTS | CHARTS AGENT BENDS PROVIDED COMPETETIVE<br>LOADING PORT AGENT HAN SHIPPING. DISHPORT SEKAVAMAR AGENCY<br><br>Han Shipping Co. Ltd. - Istanbul<br>Atasehir Bulvari<br>Gardenya 3/13, D.101<br>34758 Atasehir<br>Istanbul / Turkey<br>Phone       : +90 216 456 5773-75<br>Fax         : +90 216 456 5776<br>Telex       : +607-29682 hans tr<br>Email 1     : agency@hanship.com<br>Email 2     : info@hanship.com<br><br>PIC         : Mr. Hakan Ozgen<br>Mobile      : +90 532 322 5288 /+90 532 446 3880<br>Yahoo ID    : hanozgen<br>MSN ID      : hanozgen<br>Skype ID    : hanozgen<br><br>REVERTING ON SEKAVAMAR AGENCY DETS. |
| · DOCUMENTATION | ALL DOCUMENTATION, OPERATIONS AND CONTACTS WITH RECEIVERS WILL BE CARRIED OUT BY CHARTS AGENT. |
| · TAXES (CARGO) | ANY TAXES A/O DUES ON CARGO A/O FREIGHT TO BE FOR CHARTS A/C AND SETTLED DIRECTLY BY THE CHARTS. |
| · TAXES (VESSEL) | IF ANY TAXES A/O DUES ON VSL SAME TO BE FR OWNS ACCT. |
| :O/A INSURANCE | IF ANY OVERAGE INS TO BE FOR CHARTS A/C. |
| ·WAITING TIME FOR CGO )OCS. | MAX 3 HRS WAITING TIME FOR CARGO DOCS WHICH TO BE FR OWNERS A/C AND THEREAFTER EXCEEDING TIME TO BE FOR CHARTS A/C. |
| · LOI | IN CASE ORIGINAL B/L'S ARE NOT AVILALABLE AT DISCH PORT UPON VESSELS ARRIVAL CGO TO BE DELIVED AGAINST CHRTRS L.O.I IN OWNS PANDI CLUB WORDING. |
| · VESSELS TANKS | VSLS TANKS, LINES AND PUMPS ARE TO BE IN EVERY RESPECT FIT AND SUFFICIENTLY CLEAN IN ORDER TO LOAD THE CARGO SPECIFIED IN THE FIXTURE RECAP AND CLEANLINESS TO MEET INSPECTORS REQUIREMENTS. |

7/21/2008

| · CHARTER PARTY | ASBATANK |
| --- | --- |
| · ADD TERMS | FALOIL ADD TERMS WITH BELOW AMMENDMENTS |
| · ISPS CLAUSE | BIMCO ISPS CLAUSE TO APPLY |
| · COMS STRUCTURE | COMS  6.25  PCT TTL OUR END ON F/DF/D INCL ADDCOM WHICH TO BE DEDUCTED AT SOURSE. |
| ND | |

OWENRS CLAUSE
--------------
- CHARTERERS GUARANTEE THAT THE SEAWATER FLUSH THEY REQUIRE THE VESSEL TO UNDERTAKE AT
  MERSIN IS FREE OF CHEMICALS AND OR CHEMICAL SUBSTITUTE AND WILL NOT HARM THE VESSEL.
   VESSEL WILL UNDERTAKE THE LINE FLUSH AND RETURN AS OUTLINED IN MASTER'S COMMENTS TO
   BORACHART AND ANY TIME/EXPENSE IN UNDETAKING THIS LINE FLUSH (IN/OUT) SHALL BE FOR
   CHARTERERS ACCOUNT (LAYTIME OR DEMURRAGE).


FAL ADDITIONAL CLAUSES 1-40 TO BE AMENDED AS FOLLOWS:

CLS 1 - DELETE LAST SENTENCE
CLS 5 - ADD TO THE END OF LAST SENTENCE "THIS IS ONLY VALID IF VSL
        BERTHS AND COMMENCES LOADING BEFORE AGREED LAYCAN"
CLS 6 - DELETE
CLS 8 - AFTER "TIMES" AT PARA 2 INSERT "WHERE SAILING TIME FOR ARRIVAL
        AT PORT ALLOWS"
CLS 9 - ITEM V DELETE
CLS 10- DELETE
CLS 12- DELETE
CLS 14- DELETE
CLS 15- DELETE PARA 1,2 AND 3 AND INSERT "VSL'S OIL POLLUTION COVERAGE
        IS USD 1 BILL"
CLS 16- DELETE
CLS 19- AT LINE 1 AFTER "CLAIMS" INSERT "B/L AND CARGO CLAIMS ARE
        EXCLUDED"
CLS 21- DELETE
CLS 23- DELETE
CLS 24- DELETE
CLS 25- AT LINE 2 DELETE "DEDUCT FROM FRT" INSERT "CLAIM"
        AT LINE 4 AFTER "LIQUID" INSERT "AND PUMPABLE"
CLS 26- ADD TO THE END "CHARTERER'S VOYAGE ORDERS SHALL ALWAYS BE IN
        ACCORDANCE WITH C/P TERMS AND CLAUSES"
CLS 28- DELETE
CLS 29- DELETE
CLS 30- READ AS ABOVE
CLS 32- DELETE 1ST PARA
CLS 34- DELETE
CLS 38- A) AT LINE 1 AFTER "VESSEL" INSERT "WITH CHARTERERS RISK AND
        EXPENSE"
        C) DELETE


- CHARTERERS GTEE THAT THE SEAWATER FLUSH THEY REQUIRE THE VESSEL TO UNDERTAKE AT
MERSIN IS FREE OF CHEMICALS AND OR CHEMICAL SUBSTITUTE AND WILL NOT HARM THE
VESSEL. VESSEL WILL UNDERTAKE THE LINE FLUSH AND RETURN AS OUTLINED IN MASTERS
COMMENTS TO BORACHART AND ANY TIME/EXPENSE IN UNDETAKING THIS LINE FLUSH (IN/OUT)
SHALL BE FOR CHARTERERS ACCOUNT (LAYTIME OR DEMURRAGE)

END RECAP

This e-mail has been scanned for all viruses by Star. The
service is powered by MessageLabs. For more information on a proactive
anti-virus service working around the clock, around the globe, visit:
http://www.star.net.uk

QUESTIONNAIRE 88 (Version 2)

**INTERTANKO'S STANDARD TANKER VOYAGE CHARTERING QUESTIONNAIRE 1988 (Version 2)**
*(Metric system to be applied, HVPQ reference specified where applicable)*

| GENERAL INFORMATION | | HVPQ Ref |
|---|---|---|
| Date Updated: | 17.02.2005 | |
| Vessel's name: | GENERAL HAZI ASLANOV | 1.2 |
| IMO number: | 9333577 | 1.3 |
| Vessel's previous name(s): | - | 1.4-1.7 |
| Flag: | Russia | 1.8 |
| Port of Registry: | Taganrog | 1.9 |
| Call sign: | UEJC | 1.11 |
| Inmarsat phone number: | +873764141349 | 1.12 |
| Fax number: | +873764141351 | 1.13 |
| Email address: | 427350621@inmc.eik.com | 1.16 |
| Type of vessel: | OIL TANKER | 1.17 |
| Type of hull: | DOUBLE HULL | 1.19 |
| | | |
| **OWNERSHIP & OPERATION** | | |
| Registered owner - Full Style: | Armada Trading-3 Co.Ltd Palazzo Pietro Stiges 90, Strait Street, Valletta, Malta | 1.20 |
| Technical operator - Full Style: | Palmali Shipping Co.Ltd Ebulula Cad. Maya Siteleri No:1 L-Blok, 34335 Akatlar, Istanbul - Turkey | 1.22 |
| Commercial operator - Full Style: | Palmali Shiping Co.Ltd Ebulula Cad. Maya Siteleri No:1 L-Blok, 34335 Akatlar, Istanbul - Turkey | 1.25 |
| Disponent owner / Bareboat charterer - Full Style: | Company Limited "Palmali" 2, Prospect Budennovskiy, 344002, Rostov on Don, Russia | |
| Number of vessels in Disponent owner's fleet:: | 1 | |
| | | |
| **BUILDER** | | |
| Where Built : | ADA Shipyard, Turkey | 1.26 |
| Date Delivered: | 25.01.2005 | 1.31 |
| | | |
| **CLASSIFICATION** | | |
| Vessel's classification society: | RS | 1.34 |
| Class notation: | KM (*) LU1 [1] II A1 oiltanker (ESP) | 1.35 |
| If Classification society changed, name of previous society? | - | 1.36 |
| If Classification society changed, date of change? | - | 1.37 |
| Last dry-dock: | 25.01.2005 | 1.38 |
| Last special survey: | 25.01.2005 | 1.41 |
| Latest CAP Rating (if applicable) | N/A | 1.44 |
| Last annual survey: | - | 1.45 |
| Does the vessel have a statement of compliance issued under the provisions of the Condition Assessment Scheme (CAS)? | No | |
| | | |
| **DIMENSIONS** | | |
| LOA (Length Over All): | 138.7 | 1.49 |
| Extreme breadth: | 16.74 | 1.51 |
| KTM (Keel to Masthead): | 28.6 | 1.54 |
| BCM (Bow to Center Manifold): | 70 | 1.57.1 |
| Lightship parallel body length: | 104 | 1.57.3 |
| Normal ballast parallel body length: | 103 | 1.57.6 |
| Parallel body length at Summer DWT: | 104 | 1.57.9 |
| | | |
| **TONNAGES** | | |
| Net Tonnage: | 1904 | 1.59 |
| Gross Tonnage: | 4522 | 1.60 |

| Suez Net Tonnage: | | | | 10372.77 cub. metres | | 1.61 |
|---|---|---|---|---|---|---|
| Panama Net Tonnage: | | | | - | | 1.62 |

| LOADLINE INFORMATION | Freeboard (Metres) | Draft (Metres) | Deadweight (Tonnes) | Displacement (Tonnes) | |
|---|---|---|---|---|---|
| Summer: | 1,512 | 4,288 | 6444 | 8832 | 1.63 |
| Winter: | 1,602 | 4,198 | 6143 | 8531 | 1.64 |
| Tropical: | 1,422 | 4,378 | 6538 | 8926 | 1.65 |
| Lightship: | 4,44 | 1,35 | 180 | 2388 | 1.66 |
| Normal Ballast Condition: | 2,8 | 3,0 | 3530 | 5918 | 1.67 |

| | | |
|---|---|---|
| TPC on summer draft: | 22,5 | 1.70 |
| Does vessel have Multiple SDWT? | No | 1.72 |
| If yes what is the maximum assigned Deadweight? | - | 1.73 |
| Air draft (sea level to top of mast/highest point) in normal SBT condition? | 24,7 | 1.74 |

**RECENT OPERATIONAL HISTORY**

| | | |
|---|---|---|
| Has vessel been involved in any collision, grounding or pollution incident the past 12 months, full description: | No | 1.77-1.79 |

**CERTIFICATION**

| | | |
|---|---|---|
| Owners warrant following certificates to be valid throughout the Charter Party period: | | |
| SOLAS Safety Equipment: | 25.01.05-25.04.06-25.01.10 | 2.2 |
| SOLAS Safety Radio: | 25.01.05-25.04.06-25.01.10 | 2.3 |
| SOLAS Safety Construction: | 25.01.05-25.04.06-25.01.10 | 2.4 |
| Load line: | 25.01.05-25.04.06-25.01.10 | 2.5 |
| IOPPC: | 25.01.05-25.04.06-25.01.10 | 2.6 |
| Safety Management (ISM): | 25.01.05-24.07.05 | 2.8 |
| USCG COC: | N/A | 2.11 |
| CLC: | YES | 2.13 |
| US COFR: | 18.01.05-20.02.05 | 2.15 |
| Certificate of Fitness (Gas/Chemicals): | N/A | 2.16 & 2.17 |
| Certificate of Class: | 25.01.05-25.04.06-25.01.10 | |
| ISPS ISSC: | 16.01.05-16.01.10 | |

**DOCUMENTATION**

| | | |
|---|---|---|
| Does the vessel have the following documents on board? | | |
| International Safety Guide for Oil Tankers & Terminals (ISGOTT): | Yes | 2.28 |
| OCIMF/ICS Ship to Ship Transfer Guide (Petroleum): | Yes | 2.31 |
| Is the vessel entered with ITOPF? | Yes | |

**CREW MANAGEMENT**

| | | |
|---|---|---|
| Nationality of Master | Russian | |
| Nationality of Officers: | Russian | 3.1 |
| Nationality of Crew: | Russian | 3.2 |
| If Officers/Crew employed by a Manning Agency - Full Style: | COMPANY LIMITED "PALMALI", 2, Prospect Budennovskiy, 344002, Rostov on Don, Russia | 3.1 & 3.2 |
| What is the common working language onboard? | Russia | 3.1 |
| Do key officers understand English? | Yes | |
| In case of Flag Of Convenience (FOC), is the ITF Special Agreement on board? | N/A | |

**STRUCTURAL CONDITION**

| | | |
|---|---|---|
| Are cargo tanks coated? | Yes | 7.1 |
| If Yes, specify type of coating: | EPOXY | 7.1.1 |
| If cargo tanks are coated, specify to what extent: | Whole tank | 7.1.3 |
| Are slop tanks coated? | Yes | |
| If slop tanks are coated, specify to what extent: | Whole tank | |

**CARGO & BALLAST SYSTEMS**

| | | |
|---|---|---|
| If double hull, is vessel fitted with centreline bulkhead in all cargo tanks? | No | 8.2 |
| Groups / Tank Capacities | 7221,0 cub.m. | 8.3 |

| | | |
|---|---|---|
| Total cubic capacity 98% ex slop tank: | 7076,6 cub.m. | 8.4 & 8.6 |
| Slop tank(s) capacity 98%: | 217 cub.m. | 8.5 & 8.7 |
| SBT or CBT? | SBT | |
| If SBT, what percentage of SDWT can vessel maintain with SBT only? | 56% | 8.14.2 |
| If SBT, does vessel meet the requirements of MARPOL Reg 13(2)? | YES | 8.14.3 |
| Number of natural segregations with double valve: | 6 | 8.15 |

| **CARGO PUMPS** | | |
|---|---|---|
| Type: | Deepwell | 8.18-8.25 |
| Number: | 6+1 | 8.18-8.25 |
| Capacity: | 150 m³/h + 100 m³/h | 8.18-8.25 |

| **GAUGING AND SAMPLING** | | |
|---|---|---|
| Can tank innage/ullage be read from the CCR? | Yes | 8.48 |
| Can vessel operate under closed conditions in accordance with ISGOTT 7.6.3? | Yes | 8.51 |
| Type of tank gauging system (radar / floating / other) | Radar | 8.51.1 |
| Are high level alarms fitted and operational in cargo tanks? | Yes | 8.54 |

| **VAPOUR EMISSION CONTROL AND VENTING** | | |
|---|---|---|
| Is a vapour return system fitted? | Yes | 8.65 |
| State what type of venting system is fitted: | Plenum ventilation | 8.67 |
| Max loading rate per midships connection for homogenous cargo? | 1200 m³/h | 8.79 |

| **CARGO MANIFOLDS** | | |
|---|---|---|
| Does vessel comply with the latest edition of the OCIMF 'Recommendations for Oil Tanker Manifolds and Associated Equipment'? | Yes | 8.80 |
| What is the number of cargo connections per side? | 8 | 8.83 |
| What is the size of cargo connections? | 254 Millimetres | 8.84 |
| What is the material of the manifold? | Stainless steel | 8.86 |
| Distance between cargo manifold centres: | 500 Millimetres | 8.93 |
| Distance ships rail to manifold: | 3250 Millimetres | 8.95 |
| Distance main deck to centre of manifold: | 2790 Millimetres | 8.97 |
| Height of manifold connections above the waterline at loaded (Summer Deadweight) condition? | 4,5 Metres | 8.101 |
| Height of manifold connections above the waterline in normal ballast? | 5,79 Metres | 8.102 |
| Is vessel fitted with a stern manifold? | Yes | 8.104 |
| Number / size reducers: | 1 - 8"-10", 1 - 6"-10", 1 - 10"-12". | 8.106-8.110 |

| **CARGO HEATING** | | |
|---|---|---|
| Type of cargo heating system? | Steam | 8.120 |
| Material of heating system? | Stainless steel | 8.128 |
| Max load temp: | 60 deg Celsius | |
| Max temp maintain: | 60 deg Celsius | |

| **IGS & COW** | | |
|---|---|---|
| Is an Inert Gas System (IGS) fitted? | No | 9.1 |
| Is IGS supplied by flue gas, inert gas (IG) generator and/or nitrogen? | No | 9.3 |
| Is a Crude Oil Washing (COW) installation fitted? | No | 9.17 |

| **MOORING ARRANGEMENTS** | | |
|---|---|---|
| Number / length / diameter / breaking strength of wires: | On Drums | |
| Focsle: | --- | 10.2 |
| Main deck fwd: | --- | 10.3 |
| Main deck aft: | --- | 10.4 |
| Poop: | --- | 10.5 |
| Number / length / diameter / breaking strength of ropes: | On Drums | |
| Focsle: | 3-220m-56mm-41040 kgf | 10.11 |
| Main deck fwd: | --- | 10.12 |
| Main deck aft: | --- | 10.13 |
| Poop: | 3-220m-64mm-61632 kgf | 10.14 |
| | Other Lines | |
| Focsle: | --- | 10.15 |
| Main deck fwd: | --- | 10.16 |
| Main deck aft: | --- | 10.17 |

| | | |
|---|---|---|
| Poop: | --- | 10.18 |
| **Number and brake holding power of winches:** | | |
| Focsle: | 2 – 61 kN | 10.22 |
| Main deck fwd: | - | 10.23 |
| Main deck aft: | - | 10.24 |
| Poop: | 1 – 50 kN | 10.25 |
| **How many closed chocks and/or fairleads of enclosed type are fitted on:** | | |
| Focsle: | 7 | |
| Main deck fwd: | 4 | |
| Main deck aft: | 4 | |
| Poop: | 6 | |
| | | |
| **SINGLE POINT MOORING (SPM) EQUIPMENT** | | |
| Fairlead size: | Millimetres | 10.48 |
| Does vessel comply with the latest edition of OCIMF 'Recommendations for Equipment Employed in the Mooring of Vessels at Single Point Moorings (SPM)'? | No | 10.60 |
| Is vessel fitted with chain stopper(s)? | No | 10.61 |
| Number: | --- | 10.61.1 |
| Type: | --- | 10.61.2 |
| SWL: | Tonnes | 10.61.3 |
| Max diameter chain size: | Millimetres | 10.62 |
| | | |
| **LIFTING EQUIPMENT** | | |
| Derrick(s) - Number / SWL: | --- | 10.75 |
| Crane(s) - Number / SWL: | 1 – 2000 kg | 10.76 |
| | | |
| **ENGINE ROOM** | | |
| What type of fuel is used for main propulsion? | IFO 180 CST | 12.5 |
| What type of fuel is used in the generating plant? | Diesel Oil | 12.14 |
| | | |
| **MISCELLANOUS** | | |
| P & I Club name: | WEST OF ENGLAND | |
| Last three cargoes (Last / 2nd Last / 3rd Last): | First voyage | |
| Last three charterers (Last / 2nd Last / 3rd Last): | First voyage | |
| Last three voyages (Last / 2nd Last / 3rd Last): | First voyage | |
| Date of last SIRE Inspection: | --- | |
| Date of last CDI Inspection: | --- | |
| Current Oil Major Company Approvals (TBOOK): | --- | |
| Date and place of last Port State Control: | Kerch / 14.04.05 | |
| Any outstanding deficiencies as reported by any Port State Control? | No | |
| If yes, provide details: | --- | |
| | | |
| **FOR USA CALLS ONLY** | | |
| Qualified individual (QI) - Full Style: | --- | |
| Oil Spill Response Organization (OSRO) -Full Style: | --- | |
| Has owner, manager, or operator signed the Sea Carrier Initiative agreement with US customs concerning drug smuggling? | --- | |

FAL SHIPPING CO LTD                Asbatankvoyterms            Amended 08th Aug 2007

## FAL Shipping Co Ltd – 1 to 45 (2007)

1    **CL1.    WORLDSCALE REFERENCE**

2    Worldscale terms and conditions, as published by Worldscale Association Inc., in effect on the date of this
3    Charter Party, except as may be otherwise provided herein, shall apply to this Charter Party. Allowed
4    laytime shall always be ninety six (96) running hours.

5    **CL2.    ELIGIBILITY**

6    Owner warrants that the vessel is in all respects eligible and not prevented for any reason whatsoever for
7    trading within the ranges specified in Part I (C&D) of this Charter Party and that at all necessary times,
8    she shall have onboard all certificates, records and other documents required for such service.   If any
9    element of this warranty is breached, any delay directly resulting thereof shall not count as laytime, or if
10   the vessel is on demurrage, as time on demurrage and any damages or expenses directly incurred shall
11   be for Owners' account.

12   **CL3.    WEATHER**

13   Any delays in berthing for loading or discharging and any delays after berthing which are due to weather
14   conditions and/or sea state shall count as one half laytime or, if the vessel is on demurrage, at one half
15   demurrage rate except if ship to ship / lightering / sealine / single buoy mooring /open sea /berth where
16   time to count in full weather permitting or not. At those places any un-berthing / re-berthing due to bad
17   weather and/or sea conditions, time and expenses to be for Charterers' account.

18   **CL4.    LAYTIME & N.O.R**

19   In the event Laytime has expired, Charterers shall be allowed the benefits of Clauses 6 and 7 of Part II at
20   each port of loading or discharge before demurrage shall be incurred. Notice of Readiness given pursuant
21   to Part II Clause 6, shall not be deemed to be received by Charterers or Charterers' Agent prior to the
22   date stipulated in Part I (B) for commencing laydays except with Charterers' sanction.

23   **CL5.    EARLY BERTHING**

24   If Owners requests and Charterers agrees that the vessel commence loading prior to the commencement
25   of laydays, time between the commencement of loading and 0600 hours on the commencing date set
26   forth in Part I (B) shall, as appropriate, be deducted from or offset against any time the vessel spends
27   waiting for berth or ullage at the discharge port prior to commencement of discharge. However, if the
28   vessel proceeds direct to the discharge berth without delay, no benefit will accrue to Charterers

FAL SHIPPING CO LTD                Asbatankvoyterms                Amended 08th Aug 2007

| FAL Shipping Co Ltd – 1 to 45 (2007) |
| --- |

29    hereunder. Laytime at the load port, pursuant to this clause, shall not commence until the vessel
30    commences loading.

31    **CL6.    CANCELLATION**

32    In the event that the Vessel fails to tender a valid Notice of Readiness at the first loading port within the
33    cancelling date specified in Part I (B) and, Charterers does not cancel the Charter Party pursuant to Part
34    II Clause 5 then notwithstanding any other provision in the Charter Party, laytime shall not commence
35    until vessel's arrival in berth or forty eight (48) hours after tendering Notice of Readiness whichever is the
36    later Charterers' election not to cancel shall be without prejudice to any other claims for damages
37    Charterers may have for the late tender of Vessel's services

38    **CL7.    BALLAST**

39    The vessel shall arrive at the load port with clean ballast. However, in the event vessel discharges any
40    ballast, not withstanding the terms and conditions of Charter Party or Worldscale, such related time and
41    cost to be for Owners' account.

42    **CL8.    E.T.A**

43    Where applicable owners will instruct vessel's Master to advise Charterers of Vessel's Estimated Times of
44    Arrival (ETAs) at load and discharge ports as instructed by Charterers including but not limited to the
45    following:

46    Vessel shall advise load/discharge port terminal (via Agent) of its ETA at each of the following times:

47    (i)        Upon leaving last port of call or 96 hours before arrival whichever is less.

48    (ii)       72 hours before arrival

49    (iii)      48 hours before arrival

50    (iv)       24 hours before arrival

51    (v)        Any time ETA changes by more than 6 hours

52    Charterers shall not be liable for any demurrage in respect of any delay in loading and discharging
53    attributable to the failure of the vessel to give notice of its ETA in accordance with this clause.

## FAL Shipping Co Ltd – 1 to 45 (2007)

54    **CL9.    LAYTIME/DEMURRAGE EXCEPTIONS**

55    Notwithstanding any other provision(s) of the Charter to the contrary, the following time shall not count as

56    used laytime or, if the Vessel is on demurrage, as time on demurrage:

57    (i)    All time shifting from anchorage to first berth or first STS lightering site.

58    (ii)    All time shifting from STS lightering site to anchorage or to berth.

59    (iii)    All time lost discharging ballast water or slops, unless concurrently with cargo operations.

60    (iv)    All time awaiting cargo documents but maximum three (3) hours for owners' account.

61    (v)    All time due to an escape or discharge of oil or the threat of an escape or discharge of oil from the

62          vessel.

63    **CL10.  HEATING**

64    Owners warrant that the Vessel is capable of heating cargo to a maximum temperature of 135 Degrees

65    Fahrenheit in each tank and will maintain the loaded cargo temperature in accordance with Charterers'

66    instructions throughout loading, laden passage to discharge port(s) and discharge.  If the cargo is

67    received on board the Vessel at a temperature below 135 Degrees Fahrenheit, Charterers have the

68    option to require the Vessel to raise the temperature to a maximum of 135 Degrees Fahrenheit and

69    maintain that temperature throughout laden passage to discharge port(s) and discharge. Charterers to

70    pay for the extra bunkers consumed for heating up cargo temperature, as per Master's statement and last

71    bunker invoice. Owners to advise vessel's daily bunker consumption for raising cargo temperature. If the

72    Vessel fails to maintain the required temperature, any resulting time lost shall not count as used laytime,

73    or time on demurrage and any losses, costs or expenses incurred by Owners or by Charterers shall be for

74    Owners' account.

75    **CL11.  PUMPING**

76    Owners warrant that the vessel is capable of discharging entire cargo (be it one or more grades) as

77    stipulated in Part I (E), within twenty-four (24) hours excluding stripping and /or cowing but max allowed

78    time for stripping 3 hours), or pro rata thereof in respect of a part cargo, from the commencement of

79    pumping excluding first and last hour which not to count or that the vessel shall maintain an average

80    discharge pressure of 100 PSI at the vessel's manifold throughout the period of discharge, excluding

81    stripping and/or cowing provided that shore facilities do not restrict vessel's full pumping capacity. The

FAL SHIPPING CO LTD                Asbatankvoyterms                Amended 08th Aug 2007

## FAL Shipping Co Ltd – 1 to 45 (2007)

82  shore receiving facilities shall have the right to measure discharge pressure at the vessel's manifold. Any
83  additional time, excluding stripping for cargo recovery enhancement and Crude Oil Wash, used owing to
84  inability of the vessel to discharge in accordance with the pumping warranties above shall not count as
85  used laytime or, if the vessel is on demurrage, as time on demurrage. If the terminal or place of discharge
86  does not allow or permit the vessel to meet the above warranties or requires discharging grades
87  consecutively, the Master shall forthwith issue a Letter of Protest to such terminal or place and shall
88  immediately advise Charterers in writing by fax or email or telex. Charterers will not consider any claim by
89  Owners for additional time used in the foregoing circumstances unless Owners furnishes the following
90  documentation:

91  (i)        an hourly pumping log, signed by Master and a terminal or Charterers' representative, showing
92  the pressure maintained at the manifold throughout discharge and, in the absence of a signature from
93  terminal or Charterers' representative, a copy of a Letter of Protest,

94  (ii)       copies of all relevant Letters of Protests in addition to the one referred to in (I) above issued or
95  received by the vessel in relation to the discharge in question, and

96  (iii)      copies of any other available documents generated by the vessel or by the shore receiving
97  terminal relevant to the discharge in question.

98  Any pumping time lost solely due to restrictions imposed by the terminal or place of discharge shall count
99  as laytime or, if the vessel is on demurrage, as time on demurrage.

100  If the vessel is ordered to evacuate the terminal or discharge place due to its inability to discharge in
101  accordance with the pumping warranties above, then all related direct expenses shall be for Owners'
102  account and laytime not to be counted till vessel is ready again for discharge.

103  **CL12.  Load and Discharge Port Restrictions**

104  Owners warrant that they are aware of the physical and operational restrictions at nominated load and
105  discharge ports, terminals and berths, and will abide by same.  Possible restrictions include but are not
106  limited to: physical limitations on the vessel draft, length, beam, displacement, etc; and restrictions on
107  nighttime cargo operations, navigation and/or berthing. Any delay and/or additional costs incurred due to
108  non-compliance with restrictions shall be for Owners' account

FAL SHIPPING CO LTD               Asbatankvoyterms          Amended 08th Aug 2007

## FAL Shipping Co Ltd – 1 to 45 (2007)

109    **CL13. CARGO TRANSFER**

110    At no time during the voyage shall cargo be transferred between Vessel's tanks without the express
111    consent of Charterers. Such consent shall be requested in writing by fax or email or telex specifying
112    loaded and revised ullages and cargo quantities for the tanks concerned and reasons necessitating a
113    cargo transfer. Consent of Charterers shall not be unreasonably withheld and shall be provided in writing
114    by fax or email or telex. Master to confirm to Charterers that operation has been carried out. In the event
115    transfer of cargo is unavoidable for emergency reasons involving risk to Vessel's structural integrity or
116    safety of life or for safe navigation, the prior consent of Charterers shall not be required. However, the
117    Master shall inform Charterers of any such circumstances as soon as possible thereafter by fax or email
118    or telex.

119    **CL14. DIVERSION**

120    Notwithstanding anything else to the contrary in this Charter Party and notwithstanding what loading
121    and/or discharging ports may have been nominated and Bills of Lading issued, Charterers shall have the
122    right to change its nomination of the loading and/or discharging ports in accordance with Part I (C & D) of
123    the Charter. Any extra time and expense incurred by Owner in complying with Charterers' orders shall be
124    for Charterers' account and calculated in accordance with Part II, Clause 4 (C) of this Charter provided
125    that agreed freight is lumpsum. Extra Expenses, as described in Part II, Clause 4(C), as applicable to this
126    Clause, shall include extra bunkers consumed in diverting less normal bunkers consumed in port over a
127    comparable length of time. Freight is based on the voyage actually performed. Charterers shall have the
128    right to make as many changes as they deem necessary.

129    **CL15. OIL POLLUTION INSURANCE, P&I AND ITOPF**

130    Owner warrants that they have and will maintain throughout the period of this charter the standard Oil
131    Pollution Insurance cover currently 1 US$ BILLION available from their P&I Club

132    Owner further warrants that, throughout the Vessel's service under this Charter Party, Owner shall
133    maintain in force full and valid Protection and Indemnity Insurance. Charterers may at any time request a
134    written evidence of P&I cover and upon receipt of such a request the Owner shall provide the same.

FAL SHIPPING CO LTD                Asbatankvoyterms              Amended 08th Aug 2007

## FAL Shipping Co Ltd – 1 to 45 (2007)

135    Owner also undertakes that the vessel is a tanker owned by a member of the International Tanker
136    Owners Pollution Federation Limited and will remain so throughout the charter period.

137    **CL16.  SPEED UP**

138    Vessel to perform laden passage at a speed of 12.5 knots Weather and Safe Navigation Permitting.
139    Charterer to have the option, at any time(s) during the laden passage(s), to speed up the vessel (up to
140    the maximum sea speed obtainable by the vessel), weather and safe navigation permitting.  If Charterer
141    exercises such option, Charterers shall pay for any extra bunkers consumed at Owner's documented
142    actual replacement cost at the port where bunkers are next taken. The Master's statement shall be prima
143    facie evidence of quantities so consumed.

144    **CL17.  INTERIM PORT**

145    Base lumpsum freight is payable basis 1st loading port to last discharge port. Charterers to pay for
146    additional interim load or discharge ports(s) at cost i.e. the difference between actual steaming time from
147    the first loading port to final discharge port. Port time to count in full from arrival pilot station interim load
148    and/or discharge port(s), i.e. no allowance for notice time nor deduction for shifting even from anchorage
149    to first berth and no deduction for time lost due to tide, sea and weather conditions. Deviation and port
150    time used to be calculated at demurrage rate per day or pro rata plus cost of additional bunkers
151    consumed at F.I.F.O (First In First Out) as per Master's statement. Deviation, port time used, bunkers
152    consumed and port cost as per agents disbursement account to be paid together with freight as per
153    Owner's invoice, which later to be supported by hard copy documentation. Time bar provisions of this
154    Charter party not to apply to port expenses incurred at interim load / discharge port(s).

155    **CL18.  CHEVRON SEA TERMINALS**

156    Owner warrants that the vessel when calling at a Sea Terminal will maintain her engines in readiness and
157    will be loaded and discharged in such a manner that she at any state of loading or discharging
158    operations, is able, if necessary for any reason, to immediately shut down cargo operations, and promptly
159    disconnect hoses and mooring lines and proceed to another anchorage or area.

160    **CL19.  SHIFTING EXPENSES**

161    If more than one berth at load or discharge ports is used, shifting expenses shall be for Charterer's
162    account, except that any shifting expenses from anchorage to first berth and shifting expenses due to any
163    cause attributable to the Vessel shall be for Owner's account.

FAL SHIPPING CO LTD          Asbatankvoyterms          Amended 08th Aug 2007

## FAL Shipping Co Ltd – 1 to 45 (2007)

164    **CL20. CLAIMS TIME BAR**

165    Charterer shall be discharged and released from all liability in respect of any claims Owner may have
166    under this Charter Party (such as but not limited to, claims for deadfreight, demurrage, port expenses,
167    shifting expenses) unless claim has been presented in writing to Charterer with all available supporting
168    documents within 60 (sixty) days for demurrage claim and 90 days for other claims from the date of
169    completion discharging of cargo carried under this Charter Party. Charterer shall review and reply to
170    Owners' claims latest within 30 days upon receipt of a proper and fully documented claim. If any fully
171    documented claim/invoice is not received within the agreed time bar, it is deemed to be waived and
172    absolutely barred.

173    **CL21.  VESSEL TO VESSEL LIGHTERAGE**

174    If requested by Charterers, Owners agrees that vessel will perform a vessel to vessel lighterage operation
175    at sea at a safe location other than customary anchorage for the loading and/or discharge port(s), in
176    which event, Charterers will provide the lighterage vessel, mooring master, fenders, hoses and all other
177    equipment necessary for a safe operation in accordance with the latest OCIMF/ISGOTT guidelines. All
178    operations shall be carried out at master's discretion which not be unreasonably withheld. All time
179    consumed from vessel's arrival at the lightering site until the cargo hoses of last lightering vessel are
180    disconnected shall count as used laytime or time on demurrage, if vessel is on demurrage as calculated
181    in Part II hereof weather and/or sea conditions permit provided vessel is otherwise capable at all times of
182    loading or discharge while at the lighterage location. The Charterers shall always have the benefit of six
183    (6) hours after tendering Notice of Readiness as per Clause 6 Part II of Asbatankvoy Charter Party.
184    Owners warrant that the vessel is out-fitted and capable of safely carrying out all procedures as set out in
185    the latest revised edition of the ICS/OCIMF ship to ship transfer guide (Petroleum).

186    **CL22.  LIGHTERING OR TOPPING UP**

187    If lightening or topping up is required prior and/or after berthing at any designated port, and it is necessary
188    to lighten or top up the vessel while at a customary anchorage, time used in lightening or top up shall
189    count as used laytime and shall commence six (6) hours after anchoring and presentation of notice of
190    readiness or when the first lightering craft is moored alongside whichever first occurs. The lightering
191    anchorage shall not be considered as an additional load and/or discharge port nor an additional berth and
192    running time from the anchorage to the berth and/or from the berth to the anchorage shall not count as
193    used laytime or demurrage.

FAL SHIPPING CO LTD             Asbatankvoyterms             Amended 08th Aug 2007

## FAL Shipping Co Ltd – 1 to 45 (2007)

194  Any delays attributable to proven weather conditions shall count as full used laytime, or if on demurrage
195  as full time on demurrage.

196  **CL23. EXXON D&A**

197  Owner warrants that it has a policy on Drug and Alcohol Abuse (Policy) applicable to the Vessel which
198  meets or exceeds the standards of the Oil Companies International Marine Forum Guidelines for the
199  Control of Drug and Alcohol Onboard Ship. Under the Policy, alcohol impairment shall be defined as a
200  blood alcohol content of 40 mg/100 ml or greater. The appropriate seafarers to be tested shall be all
201  Vessel officers and the Drug/Alcohol testing and screening shall include unannounced testing in addition
202  to routine medical examinations. An objective of the policy should be that the frequency of the
203  unannounced testing be adequate to act as an effective abuse deterrent, and that all Officers be tested at
204  least once a year through a combined program of unannounced testing and routine medical
205  examinations. Owner further warrants that the Policy will remain in effect during the term of this Charter
206  and that Owner shall exercise due diligence to ensure that the Policy is complied with. It is understood
207  that an actual impairment or any test finding an impairment shall not in and of itself mean the Owner has
208  failed to exercise due diligence.

209  **CL24. INERT GAS SYSTEM**

210  Owner undertakes that the vessel is equipped with a fully operational Inert Gas System (IGS) which is in
211  use on the date of this Charter Party and shall so remain during the period of this Charter Party and that
212  the officers and crew are properly qualified and experienced in the operation of such system. Owner
213  further undertakes that the vessel shall arrive at loading port(s)/place(s) with its cargo tanks inert with an
214  atmosphere below 8% oxygen by volume and that such tanks shall remain inert throughout the time of
215  commencement of loading of cargo until the completion of discharge of the cargo. Any time lost, whether
216  or not the vessel is on demurrage, owing to deficient or improper operation of the Inert Gas System, shall
217  be for Owner's account. The vessel's Inert Gas System shall fully comply with Regulation 62, Chapter II-2
218  of the SOLAS Convention 1974 as modified by its protocol of 1978 and Owner undertakes that such
219  system shall be operated by the officers and the crew in accordance with the operational procedures set
220  out in the IMO publication entitled "Inert Gas System 1983" as may, from time to time, be amended.

221  **CL25. CRUDE OIL WASHING & CLOSED LOADING**

222  Charterers shall have the right to require the vessel, if it so equipped, to Crude Oil Wash the cargo tanks
223  and, in such case, the allowed pumping hours (i.e. the twenty four hours of pumping time or the number
224  of pumping hours taken to discharge the entire cargo when vessel maintains the applicable manifold

## FAL Shipping Co Ltd – 1 to 45 (2007)

225 pressure whichever is applicable) shall be increased by the actual time used in performing Crude Oil
226 Washing up to maximum 9 hours for Crude Oil Washing to be for Charterers account. If less than all the
227 tanks are washed, the said maximum hours shall be prorated on the basis of the number of tanks washed
228 to the total number of cargo tanks and the hours resulting from such pro ration shall be added to the
229 allowed pumping hours. The officers and the crew shall be fully qualified and experienced in Crude Oil
230 Washing procedures. In the absence of instructions from Charterers that the vessel conducts Crude Oil
231 Washing, the vessel may nevertheless do so to comply with Marpol 1973/78 minimum Crude Oil Washing
232 requirements. In such circumstances the allowed pumping hours shall be increased as aforesaid. If crude
233 Oil Washing is not conducted, Charterers shall have the right to require vessel to remain at berth for
234 clingage rundown or other cargo recovery technique. The time for such clingage rundown or other cargo
235 recovery technique shall not exceed ten (10) hours and the time so used shall count as laytime or, if
236 vessel is on demurrage, as time on demurrage. Owners also warrants that the vessel can and will operate
237 in a full closed loading mode throughout the term of this Charter Party.

238 **CL26.  CARGO RETENTION**

239 In the event that any cargo remains on board upon completion of discharge, Charterers shall have the
240 right to claim from owners an amount equal to the FOB value at loading port of such cargo plus freight
241 due with respect thereto, provided that the volume of cargo remaining on board is liquid pumpable by
242 ship's fixed pumps as determined by an independent cargo surveyor.  Any action or lack of action in
243 accordance with this provision shall be without prejudice to any rights or obligations of the parties.

244 **CL27.  FAILURE TO COMPLY WITH CHARTERERS VOYAGE INSTRUCTIONS**

245 Owner shall be responsible for any time lost, costs, delays or losses suffered by Charterers due to
246 Owner's failure to comply with Charterers' voyage instructions as received from Charterer provided such
247 voyage instructions are not contradicted against charter party. Any breach of Owners' representations
248 and warranties shall constitute a material breach and shall entitle Charterers, at its option, to terminate
249 the Charter and/or recover any actual damages allowed by law. Any delays resulting from non-
250 compliance with Owners' representations and warranties shall not count as used laytime or, if the Vessel
251 is on demurrage, as time on demurrage.

252 **CL28.  EXCESS BERTH OCCUPANCY**

253 If after the disconnection of hoses, the vessel remains at berth exclusively for ship's purposes other than
254 by reason of force majeure the Owner will be responsible for actual direct costs charged to buyers by
255 terminal/receivers.

FAL SHIPPING CO LTD              Asbatankvoyterms              Amended 08th Aug 2007

<div style="border:2px solid black; display:inline-block; padding:4px;">

## FAL Shipping Co Ltd – 1 to 45 (2007)

</div>

256    **CL29.  BLENDING**

257    (A)   Charterers to have the option at their time and risk to perform co-mingling, blending operation(s) on
258    board vessel during loading, upon completion of loading or at intermediate port(s) or en route to
259    discharge port(s). Co-mingling/blending of grades shall always be subject to Master's loading plan and
260    approval which not to be unreasonably withheld. If new set(s) of Bills of Lading is (are) required to be
261    issued by Charterer, then Charterer to ensure that all original copies of "Old" Bills of Lading are given to
262    Owner (or Owner's representative or Agent) or to Master beforehand.

263    (B)    Neither Master or Owners to be held responsible for any damage or contamination affecting the
264    quality of the end products as a result of Master following Charterers' instruction regarding handling of
265    cargo.  In any event Charterers before any blending/commingling is performed must provide owners with
266    a Letter Of Indemnity for above commingling/blending operation in owners wording. Letter Of Indemnity
267    always to be signed by an authorised officer of the Charterers.

268    **CL30.  BACKLOADING**

269    Charterers shall have the option to top off and/or discharge and/or blend and/or reload part or full cargo at
270    one or more safe port(s) or Ship-to-Ship (STS) location(s) throughout the voyage. Charterers shall
271    reimburse Owners for any additional time used for deviation and in port (except for delays due to vessel's
272    breakdown and/or failure) at the demurrage rate as stipulated in Part I (I), port charges, bunkers
273    consumed, cleaning and/or other additional expenses incurred by Owners for complying with this clause,
274    however limited to the expenses which exceed those expenses would have been incurred at the basic
275    voyage. Discharge/reload port(s) or location(s) shall not count as additional load or discharge port(s) or
276    location(s) and Charterers shall not be restricted by geographical rotation or by load/discharge range(s)
277    specified in Part I (C & D) of this Charter Party. The reasonable, estimated costs will be payable as an
278    account payment together with freight, followed by an actual documented invoice plus supporting
279    documents as soon as possible but not later than 60 days after completion of this voyage.

280    **CL31.  AGENCY**

281    Unless otherwise agreed, Charterers shall nominate the vessel's Agent at each port/place of loading and
282    discharge. Such agents shall be appointed, instructed and paid for by Owners provided competitive.

## FAL Shipping Co Ltd – 1 to 45 (2007)

283 **CL32.  BUNKER**

284      a. Unless otherwise agreed at time of fixing, vessel will sail from every port with enough bunkers
285 to reach the next scheduled port, or if proceeding for orders, then to reach the furthest port to which it
286 could be ordered, and will not stop enroute to take on additional bunkers.

287      b. Charterers or their affiliates, have the right of supplying bunkers, provided price and quality are
288 competitive with other suppliers. If, for any specific delivery, the price quoted by the Charterers or their
289 affiliates can be shown as not being competitive with a bona fide offer from other suppliers for such
290 requirement, then Charterers or affiliate shall have the option of meeting such price. Charterers shall have
291 the right to deduct the value of bunkers supplied by them or their affiliates from the final freight.

292      c. Owner shall allow Charterers independent inspectors to survey all bunker / diesel tanks at load
293 port and discharge port with resulting extra time, if any, to count as used laytime. Owners shall
294 additionally provide Charterers with a statement signed by vessel's Master and Chief Engineer specifying
295 actual quantities of vessel's own bunkers consumed between bunker survey.

296 **CL33.  BP ISM**

297 Owner undertakes that from the date of coming into force of the International Management Code for the
298 safe operation of ships and for pollution prevention (the International Safety Management (ISM) Code) on
299 the 1ˢᵗ july 1998, and for the duration of the Charter, the vessel and the company (as defined in the ISM
300 Code) shall comply with the requirement of the ISM Code. Charterers may at any time request an
301 inspection of the relevant document of compliance and/or safety management certificate, and upon
302 receipt of such a request the Owner shall provide the same.

303 Without prejudice to any rights or remedies available to the Charterer under the terms of this Charter or
304 under English Law, in the event of a breach of the above undertaking any loss damage, expense or delay
305 following thereof shall be for Owners' account.

306 **CL34.  BILL OF LADING**

307 Owners agree to discharge cargo against one original Bill of Lading placed on board provided such Bill(s)
308 states 'to order' or states discharge port(s) or discharge range(s) as per Charter Party. Master shall sign
309 receipt for one original Bill of Lading and release to receivers via appointed agents at discharge port.

FAL SHIPPING CO LTD            Asbatankvoyterms            Amended 08th Aug 2007

## FAL Shipping Co Ltd – 1 to 45 (2007)

310   In the event Bill(s) of Lading are not available on board or at discharge port, or incorrectly state discharge
311   port(s) or range(s), then Owner agrees to discharge cargo against Letter of Indemnity for non-production
312   original Bill(s) of Lading and/or change of destination in accordance with Owner's P&I Club wording
313   countersigned by Charterer.

314   The Letter of Indemnity issued shall automatically become null and void upon presentation of original
315   Bill(s) of Lading or thirteen (13) months after issuance, provided within such time no legal proceedings
316   have been initiated against Owners.

317   **CL35.  THIRD PARTY ARREST**

318   In the event of arrest or other sanction levied against the vessel or Charterers arising out of Owners'
319   breach or any fault of Owners, Owners shall indemnify Charterers for any damages, penalties, costs and
320   consequences and any time vessel is under arrest is fully for Owners' account.

321   **CL36.  WAR RISK**

322   Owners shall effect War Risk Insurance in respect of the Hull and machinery of the vessel and their other
323   interests (including but not limited to, loss of earnings and detention and their protection and indemnity
324   risks) and the basic premiums and/or calls therefore shall be for Owners' account. War Risks Insurance
325   additional premiums directly incurred as a result of the vessel entering an excluded area shall be for
326   Charterers' account, net of all discounts or rebates received by Owners, and provided always that
327   Charterers are given an indication of the expected amount of additional premium as soon as possible
328   and, in any event, before such additional premium are paid. The benefit of discounts or rebates on
329   additional premium received by Owners from their War Risk Insurers, Underwriters or brokers shall be
330   credited to Charterers in full. Charterers shall reimburse Owners any amounts due under this clause upon
331   receipt of Owners' invoice together with reasonable supporting documentation including all associated
332   debit and credit notes, if any. For the avoidance of doubt any specific "blocking and trapping", "loss of
333   profit", "loss of hire", or "loss of bunkers" insurance taken out by Owners in respect of the vessel, and any
334   additional premium relating thereto arising from Charterers trading of the vessel, shall be for Owners'
335   account.  Crew bonus shall be for Owners account.

336   Vessel's hull and machinery insured value is ......

337   **CL37.  ASSIGNMENT**

## FAL Shipping Co Ltd – 1 to 45 (2007)

338  Notwithstanding any other provisions of this Charter Party, Charterers may at any time assign all the
339  benefit of and all its rights, obligations and duties under the Charter (whether accrued, subsisting, future
340  or contingent) to any affiliated or associated company, which may in turn assign and transfer all such
341  benefits, rights, obligations and duties to any other such company on the same terms provided always
342  that no such assignment or transfer shall take place after legal proceedings have been served on or
343  arbitration commenced and notified to the Charterers or such company in respect of any accrued
344  obligation or duty binding on the company so served or notified. Charterers shall always remain
345  responsible for the due fulfilment of the charter partying all terms and conditions.

346  **CL38.  CLEANING**

347  Vessel to arrive at load port(s) with her tanks, pipes and pumps, suitably prepared to load Charterer's
348  intended cargo, to Charterer's inspector's satisfaction and further Owner to ensure that all traces of tank
349  washings or chemicals, if used, are removed from tanks, pumps and lines intended for carriage of
350  designated cargo. Any delays as a result of vessel arriving at load port and not being in a suitable
351  condition to load the designated cargo to be for Owner's account, and time not to count as used laytime
352  or time on demurrage, if vessel is on demurrage. The vessel shall carry out further cleaning and if 24
353  hours after first inspection the vessel is still unsuitable, Charterers shall have the option to cancel the
354  charter party within 48 hours thereafter.

355  **CL39.  I.T.F**
356  Owners warrant that vessel complies with ITF (or its equivalent) standards and has certificate for same on
357  board. Any time lost and extra expenses incurred as a result of non-compliance of this clause shall be for
358  Owners' account.

359  **CL40.  ADDRESS COMMISSION**

360  Charterers are entitled for a 1.25% address commission on freight, deadfreight and demurrage, which
361  has the right to deduct at source.

362  **CL41.  SURVEY & SAMPLE**

363  (a)  Charterers' representative may board the Vessel at any port of call to observe cargo handling
364  operations, to inspect logs and certificates, and to confirm that Owner is fulfilling its obligations under this
365  Charter.

FAL SHIPPING CO LTD                Asbatankvoyterms                Amended 08th Aug 2007

## FAL Shipping Co Ltd – 1 to 45 (2007)

366    (b)    Charterers have the option to embark its representative en route to and/or from load port by launch
367    or helicopter. The representative will stay on board en route to load port for the minimum time necessary
368    to check OBQ, slops, sound and sample bunker tanks and to discuss with Master and Chief Officer de-
369    ballasting, loading procedures, and accurate cargo documentation. The representative will stay on board
370    en route from load port for the purpose of checking ship's ullages, water dips, sampling cargo, sound and
371    sample bunker tanks, etc., and discuss with Master and Chief Officer about the discharging operation. All
372    ascertainment and discussions shall generally be made with the Vessel steaming and without loss of time
373    or deviation for the Vessel. All expenses to embark and disembark, launch hire, helicopter, agency fees,
374    any deviations or delay in connection with the representative boarding, including possible time lost, shall
375    be paid by Charterers.

376    (c)    Charterers also has the option to order the Vessel after loading to make an unscheduled call at a
377    port or ports for purposes of sampling cargo with all time lost at demurrage rate, extra bunkers as per last
378    bunker invoice at replacement cost, and port expenses at the unscheduled port(s) for Charterers'
379    account.

380    (d)    Vessel is to have on board the calibration tables for its tanks calculated by the builder or by a
381    reputable independent international surveyor.

382    **CL42.  ISPS/MTSA**

383    **(a)(i)** The Owners shall comply with the requirements of the International Code for the Security of Ships
384    and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the
385    Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or
386    passing through United States waters, the Owners shall also comply with the requirements of the US
387    Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by
388    the MTSA).

389    **(ii)** Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship
390    Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details
391    of the Company Security Officer (CSO).

392    **(iii)** Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused
393    by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the
394    ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this
395    Charter Party.

FAL SHIPPING CO LTD                Asbatankvoyterms                Amended 08th Aug 2007

## FAL Shipping Co Ltd – 1 to 45 (2007)

396    **(b)(i)** The Charterers shall provide the Owners and the Master with their full style contact details and,
397    upon request, any other information the Owners require to comply with the ISPS Code/MTSA.

398    **(ii)** Loss, damages or expense (excluding consequential loss, damages or expense) caused by failure on
399    the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as
400    otherwise provided in this Charter Party, and any delay caused by such failure shall count as laytime or
401    time on demurrage.

402    **(c)** Provided that the delay is not caused by the Owners' failure to comply with their obligations under the
403    ISPS Code/MTSA, the following shall apply:

404    **(i)** Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to
405    tender Notice of Readiness even if not cleared due to applicable security regulations or measures
406    imposed by a port facility or any relevant authority under the ISPS Code/MTSA.

407    **(ii)** Any delay resulting from measures imposed by a port facility or by any relevant authority under the
408    ISPS Code/MTSA shall count as laytime or time on demurrage, unless such measures result solely from
409    the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the
410    crew or the identity of the Owners' managers.

411    **(d)** Notwithstanding anything to the contrary provided in this Charter Party, any costs or expenses
412    whatsoever solely arising out of or related to security regulations or measures required by the port facility
413    or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security
414    guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the
415    Charterers' account, unless such costs or expenses result solely from the negligence of the Owners,
416    Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the
417    Owners' managers. All measures required by the Owners to comply with the Ship Security Plan shall be
418    for the Owners' account.

419    **(e)** If either party makes any payment which is for the other party's account according to this Clause, the
420    other party shall indemnify the paying party.

421    **CL43.  ICS/OCIMF/ISGOTT**

422    Owner warrants that vessel complies with the latest edition of The International Chamber of Shipping,
423    OCIMF (Oil Companies International Marine Forum) and ISGOTT (International Safety Guide Oil Tankers
424    and Terminals) 1984.

FAL SHIPPING CO LTD          Asbatankvoyterms          Amended 08th Aug 2007

## FAL Shipping Co Ltd – 1 to 45 (2007)

425 **CL44.  PRIVACY**

426 All negotiations and details of this fixture shall be kept strictly private and confidential and not to be
427 reported by any party.

428 **CL45.  NON-SCRAPPING CLAUSE**

429 Owners warrant that the performing vessel will not be scrapped directly after the voyage under this
430 Charter Party.

Exhibit B

**LAYTIME and**
**DEMURRAGE**
**CALCULATION**

| | |
|---|---|
| **VESSEL** | **GENERAL HAZI ASLANOV** |
| **CHARTERER** | Fal Shipping Co Ltd |
| **CHARTER PARTY** | 18.12.2007 |
| **LOADING/DISCHARGE PORT** | Mersin - Thessaloniki |
| **LAYTIME ALLOWED** | 40 hours ttl + 6 hours NOR |
| **DEMURRAGE RATE** | US$ 8,000 per day pr |

Loading port Mersin - Tuta terminal

| EVENT | TIME | DATE | DAYS | HOURS | MINUTES |
|---|---|---|---|---|---|
| **NOR tendered** | 2230 | 19/12/07 | | | |
| **All Fast** | 1510 | 20/12/07 | | | |
| **Hoses disconnected** | 0300 | 28/12/07 | | | |
| **Documents on board** | 1815 | 28/12/07 | | | |
| **LAYTIMECOMMENCED:** NOR + 6 hours | 0430 | 20/12/07 | | | |
| **LAYTIME ENDS:** Documents on board | 1815 | 28/12/07 | | | |
| **LAYTIME USED:** from | 0430 | 20/12/07 | | | |
| to | 1815 | 28/12/07 | 8 | 13 | 45 |
| **DEDUCTIONS:** Shifting from | 1320 | 20/12/07 | | | |
| to | 1510 | 20/12/07 | 0 | 1 | 50 |
| Tank washing (invoiced separately) from | 0600 | 23/12/07 | | | |
| to | 0900 | 25/12/07 | 2 | 3 | 0 |
| Documents allowance - 3 hours from | 0300 | 28/12/07 | | | |
| to | 0600 | 28/12/07 | 0 | 3 | 0 |
| Total deductions | | | 2 | 7 | 50 |
| **Net laytime used** | | | 6 | 5 | 55 |

**Continued on page 2**

**GENERAL HAZI ASLANOV** - page 2

| Discharging port Thessaloniki - HP berth | | | | | |
|---|---|---|---|---|---|
| EVENT | TIME | DATE | DAYS | HOURS | MINUTES |
| **NOR tendered** | 1900 | 01/01/08 | | | |
| **All Fast** | 1000 | 04/01/08 | | | |
| **Hoses disconnected** | 0245 | 05/01/08 | | | |
| **Documents on board** | | | | | |
| **LAYTIMECOMMENCED:** NOR + 6 hours | 0100 | 02/01/08 | | | |
| **LAYTIME ENDS:** Hoses disconnected | 0245 | 05/01/08 | | | |
| **LAYTIME USED:** | | | | | |
| from | 0100 | 02/01/08 | | | |
| to | 0245 | 05/01/08 | 3 | 1 | 45 |
| **DEDUCTIONS:** Shifting | | | | | |
| from | 0840 | 04/01/08 | | | |
| to | 1000 | 04/01/08 | 0 | 1 | 20 |
| **Net laytime used** | | | 3 | 0 | 25 |

| SUMMARY | | DAYS | HOURS | MINUTES |
|---|---|---|---|---|
| Net laytime used Mersin | | 6 | 5 | 55 |
| Net laytime used Thessaloniki | | 3 | 0 | 25 |
| Total laytime used | = | 9 | 6 | 20 |
| Less Laytime allowed: | | | | |
| 40 hours | = | 1 | 16 | 0 |
| **Time on demurrage** | | 7 | 14 | 20 |
| **Days on demurrage** | = | 7.5972 | | |
| **Demurrage rate:** | | | | |
| As per C/P | = | US$ 8,000 per day pr | | |
| **Demurrage Incurred:** | | | | |
| | | | | US$ |
| 7.5972 days at US$ 8,000 per day | = | | | 60,777.60 |
| Less payment on account within freight invoice | = | | | 21,483.00 |
| | | | | US$ |
| Total balance demurrage due | = | | | **39,294.60** |

SSL 080114231                                                                                          E&OE